**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 1 8 2019

JAMES W. McCORMACK, CLERK
By:_____
                                    DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### ~~LITTLE ROCK~~ DIVISION
### CENTRAL

**MARK BOWLING**
an individual                                                **PLAINTIFF**

**vs.**                          CASE NO: 4:19-cv-909-JM

**UNITED STATES FEDERAL
BUREAU OF INVESTIGATIONS**
**a division of the United States Department
of Justice**                          This case assigned to District Judge **Moody**
**RANDALL COLEMAN**              and to Magistrate Judge **Kearney**
**In his Official Capacity as Special Agent
in Charge of the Little Rock FBI Office.**
**DAVID SHEPARD**
**In his Official Capacity as Assistant
Special Agent in Charge**                               **DEFENDANTS**

## COMPLAINT

Plaintiff, Mark Bowling, acting Pro Se, and for his Complaint against Defendants,

Randall Coleman, David Shepard and The United States Federal Bureau of Investigations

("FBI") states as follows:

### Parties

1) Plaintiff, Mark Bowling ("Bowling"), is and was at all relevant times in this case a

resident of Saline County, Arkansas. Bowling was an employee of the FBI in their Little Rock,

Arkansas Offices.

2) Defendant, FBI, is a division of the United States Department of Justice with offices

in Little Rock, Arkansas.

3) Defendant, FBI, is an employer within the meaning of Title VII of the United States

Code.

4) Defendant Randall Coleman ("Coleman") was the Special Agent in Charge ("SAC")

1

of the FBI's Little Rock Offices and the direct supervisor of Plaintiff.

5) Defendant, Shepard was the Assistant Special Agent in Charge ("ASAC") of the Little Rock FBI Offices and a direct peer of Plaintiff.

6) Plaintiff was an employee of Defendants within the meaning of Title VII of the United States Code.

## Jurisdiction

7) Plaintiff brings this action to redress violation of religious discrimination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 et seq.: the Civil Rights Act of 1886, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991; the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-101.

8) Subject Matter Jurisdiction is proper in this Court pursuant to 28 U.S. C. § 1331. This Court has subject matter jurisdiction over Plaintiff's Arkansas state law claims pursuant to 28 U.S.C. § 1367.

9) Venue is proper in the Eastern District of Arkansas pursuant to 28 U.S.C. § 1391.

10) Plaintiff has exhausted all required administrative remedies and has received notice of his right to sue from the Equal Employment Opportunity Commission ("EEOC"). A true and correct copy of the EEOC notice is attached to this Complaint as Exhibit "A" and is incorporated herein by reference as if fully set forth in this Complaint. Plaintiff has also exhausted his remedies through the FBI's Office of Inspector General ("OIG") by making a compliant to the OIG in 2014 with no results. Finally, the Plaintiff has also exhausted his remedies by submitting an SF-95, a Federal Claim as defined by the Federal Tort Claim Act, directly to the FBI on September 5, 2015. A true and correct copy of the cover letter for this Federal Claim, and all

2

relevant sections of the SF-95 are attached to this Complaint as Exhibit "B" and is incorporated herein by reference as if fully set forth in this Complaint.

**Statement of Case**

11) Plaintiff began his employment with the FBI as a Special Agent ("SA") on July 23, 1995. Bowling served the FBI in numerous positions and received exceptional reviews for his work performance in every role that he served within the FBI.

12) Bowling served in Little Rock as the National Security Branch Assistant Special Agent in Charge ("ASAC") until July 27, 2012, when he was forced out as ASAC and forced to join the Intelligence Program. He served in Squad 11, the Human Intelligence Squad.

13) Bowling has been a committed and outspoken man of faith. Specifically, he is an Evangelical Christian, as such he is a member of a protected class as defined in Title VII.

14) As part of Bowling's faith, Bowling is a committed and engaged Father who was determined to attend as many of his children's events as possible. Bowling often would arrive to work at a very early hour so that he could complete his daily work and be able to attend his son's events in the early evening.

15) As such, Bowling not only suffered religious discrimination but also Parental Status Discrimination and retaliation for questioning a possibly unconstitutional order given to him by Defendant Coleman.

16) Very soon after Coleman's arrival, in early June, 2012 Coleman directed Bowling, as the LR NSB ASAC to undertake a covert act which Bowling recognized to be unconstitutional. Coleman began his direction by asking Bowling how many Cleared Defense Contractors ("CDCs") were operating in the State of Arkansas.

17) Bowling replied that there were 35 to 40 CDCs, approximately, geographically located in Arkansas. Coleman then inquired how many employees there were working for those CDCs. Bowling responded that he would estimate approximately 1,500 to 2,000. Coleman then directed Bowling to contact the CDCs and aggregate a list of all of the names of cleared employees who were working for the CDCs.

18) Bowling was then instructed to take that list and proactively data mine State Department Passport data and Homeland Security Department border ingress and egress data to identify when each and any of those 1,500 to 2,000 individuals traveled to another country. Whenever any one of those individuals was determined to have traveled internationally, Bowling was to contact the Defense Security Service to determine if the identified travelers had filed the appropriate international travel paperwork, as required by their security clearances.

19) Bowling was immediately concerned that this order could be a violation of privacy rights, by conducting un-predicated investigations against US persons for whom there had been no reasonable allegation of wrong-doing. Bowling asked several individuals if this type of intrusive and un-predicated data mining had ever been conducted and directed them to research it.

20) Bowling determined that this type of intrusive surveillance of US persons' private travel had not previously been conducted. Bowling then asked Coleman how to file this investigative activity, suggesting an Assessment. Coleman's response was that it did not need to be documented unless we identified CDC employees who were in violation of DSS requirements by failing to report their international travel in a timely manner.

21) Bowling recognized this direction as a violation of the DIOG, by conducting both un-predicated investigative activity and conducting investigative activity without documenting it

4

to an appropriate Assessment, Preliminary Inquiry, or Full Field Investigation.  Troubled by this, Bowling expressed his concern to Coleman and asked Coleman for this direction in writing. Bowling sought a written directive from Coleman so that he would evidence of the illegal request to support a possible Whistleblower Complaint. Coleman was clearly upset with Bowling for questioning him.  Coleman never provided the direction in writing and ceased to discuss the matter with Bowling.

22) On July 20, 2012, at or around 3:30 pm, Coleman made the following three statements which were discriminatory against Plaintiff's religious conviction to be a dedicated father and his parental status.  Coleman stated to the Plaintiff as follows:

- "The real problem is that you want to be both Super Dad and my ASAC, and you can't do both."
- "You want to go to track meets and basketball games on Friday afternoons and you can't do that if you want to be my National Security ASAC."
- "Your priorities are in the right place, really, but not for where you are in the bureau, not to work for me."

23) Plaintiff's past three performance appraisals for FY 2009, FY 2010, and FY 2011 were Outstanding (4.89), Outstanding (4.89), and Excellent (4.44).  The only thing that had changed between Plaintiff's performance appraisal in October 2011 and the July 20, 2012 conversation was the arrival of Randy Coleman at the Little Rock Office in the late Spring of 2012.  The performance of Bowling's branch, the Little Rock National Security Branch (NSB), during all of FY 2011 and all of the FY 2012 rating period, further substantiates the effectiveness of Bowling's field operations.   This outstanding field operational performance was further demonstrated by the performance of Bowling's Cyber Squad and Cyber Program in the Detroit Field Office in FY 2009 and FY 2010, in which Bowling's Cyber Program scored a perfect 500 in both years on the SAPR.

24) Despite having a stellar performance record at the FBI. Coleman threatened Plaintiff with negative job treatment unless he spent less time with his children. In the same July 20. 2012 conversation that Coleman instructed Plaintiff to stop being "super dad". Coleman also threatened Plaintiff with negative employment action.

25) Specifically, Coleman threatened Plaintiff in the July 20, 2012 conversation to place Plaintiff on a Performance Improvement Plan as a discriminatory action. His exact words were, "I am not going to place you on this plan to improve your performance. I am placing you on this plan so that I can find a way to fire you." This statement, as it was made shortly after Bowling's questioning of Coleman's directive to unconstitutionally surveil American citizens and contemporaneously with the above statements about Plaintiff's commitment to attend his children's activities, clearly demonstrates that Coleman was willing to, and intended to, misuse the PIP process to falsely substantiate justification to fire Plaintiff based exclusively on his questioning of Coleman's unconstitutional directive, his religious beliefs and parental status.

26) Coleman also threatened to misuse the "Loss of Effectiveness" transfer mechanism as a discriminatory action against the Plaintiff. Again, His exact words were, "I know the Deputy Director personally, and no matter what you do, I am going to have you transferred out of the division."

27) The fact that this was a proposed misuse of this tool is demonstrated by Plaintiff's performance immediately before Coleman's arrival. This proposed misuse was further demonstrated by Bowling's performance since he stepped out of management on July 27, 2012. Since that period of time, Bowling's performance has consistently been recognized by his supervisors as either Excellent or Outstanding, as a general rule. The threatened misuse of the

Loss of Effectiveness transfer was clearly targeted, within the context of the conversation, at Bowling's family, in order to geographically separate him from them.

28). Shepard's animosity towards Christians and his willingness and history of using OPR and other investigations against Christians is established by an ongoing pattern of discriminatory activity by Shepard over the past three years.

29) This activity both preceded his discriminatory actions against Plaintiff, and after Shepard's discrimination against Plaintiff.

30) In this continuing pattern of discriminatory activity Shepard targeted several individual Evangelical Christians through the use of false and misleading allegations, in an attempt to personally damage them. This pattern of discriminatory activity is as follows:

- A former SSRA was the subject of a discriminatory and retaliatory OPR initiated by Shepard because she was an Evangelical Christian. Shepard falsely accused her of consuming alcohol while at work in an FBI space. In spite of the legal restriction against retaliatory action by the FBI against whistle-blowers, she was removed from her position as the in the Marion RA, based on false statements by Shepard to his supervisor. This was an abuse of both the OPR investigative process and the use of a Loss of Effectiveness transfer in retaliation for this Christian Agent initiating a whistle-blower action. Shepard is the subject of a separate but related, EEO action which was initiated by this Agent. It is related because this statement makes specific reference to sexist and discriminatory statements by Shepard. This agent is an Evangelical Christian who is a Southern Baptist.

- A former SSA and Little Rock Counterintelligence Supervisor was the subject of a DOJ OIG investigation initiated by Shepard. Based on an unreliable CHS, Shepard falsely alleged that this former supervisor provided the identity of one CHS to another CHS, which had been previously assigned to him. This DOJ OIG investigation determined that there was no evidence of any wrongdoing by the former supervisor. This investigation was initiated by Shepard. Plaintiff personally observed Shepard acting gleefully as he improperly and unprofessionally discussed the investigation of the former supervisor. At the time I advised Shepard that the investigation was unfounded and unnecessary. As the Supervisor's ASAC at the time, I did not believe that the investigation was justified or necessary. This was an abuse of the Department of Justice OIG Investigative process by Shepard and was motivated by his discriminatory personal dislike for this former supervisor, because the former supervisor is an Evangelical Christian. During the investigation Shepard also came to the Plaintiff to brag about how his friends at Security Division were monitoring the former supervisor's use of his Bureau assigned Blackberry cellular telephone to talk to people. I believed

this was an abuse by Shepard for two reasons. First, Shepard should not have been discussing the matter with anyone, nor should Shepard have been discussing the use of intrusive technical surveillance. The former Supervisor was very open about being an Evangelical Christian who attends the Bible Church of Little Rock.

- In March 2012, a former Little Rock FBI Chief Security Officer ("CSO") notified Shepard of his resignation from the LR CSO position to take the position of Director of the Security and Investigations Center at the Veteran's Administration facility in North Little Rock. When he did so, the former CSO was advised by ASAC Shepard that Shepard had attempted to discriminatorily OPR him for discussing the format of the FBI file structure with personal attorneys as part of a lawsuit against a local law enforcement agency. The intent of this discriminatory action by Shepard was so that this CSO would "leave the Bureau under a cloud", and thereby not be ever considered for future reemployment with the FBI. This was a discriminatory abuse of the FBI OPR investigative process. The former CSO is an Evangelical Christian who attended First Baptist Church of Benton, AR. at the time.

31) As further evidence, to demonstrate and establish Shepard's discriminatory mindset and attitudes, during 2012 and 2013, Shepard made numerous statements which were discriminatory against Christians.

32) These verbal statements revealed his discriminatory attitude toward and opinion of Evangelical Christians. Most specifically was a statement to FBI Agent Michael Casanova, assigned as the CHS Coordinator for the Little Rock Office in 2013. In 2013 Shepard specifically stated to Casanova that his opinion of Christians was similar to the opinion of former Minnesota Governor Jesse Ventura. Shepard verbally expressed his discriminatory mindset and stated to Casanova the he, Shepard, believed Christians to be psychologically weak and in need of a crutch.

33). As evidence of Shepard's overall discriminatory attitude, Plaintiff personally heard Shepard make several sexist and racist statements, with regards to other individuals. While these statements do not directly impact Plaintiff, it demonstrates Shepard's overall prejudicial and discriminatory attitudes.

8

34) During the fall of 2011, soon after Shepard's arrival in Little Rock, Shepard, on two occasions, made sexist statements in a discriminatory and derogatory manner. The first of these statements was with regards to a female SAC and a female SSA. These two women were known to be friendly, having previously worked together in Washington, D.C. at FBI HQ. Shepard walked into Plaintiff's ASAC office at near the end of the day, was making comments in a derogatory and sexist tone, making a rude facial expression, with regards to the "Girl's Club". Plaintiff asked Shepard what he was talking about, and Shepard stated it was when these two female officers were speaking to each other in their offices. One of the female agents was Plaintiff's subordinate at the time and Plaintiff considered both to be friends who he had vast respect for. Plaintiff advised Shepard that, "Dave, I don't really need to hear it."

35) The second sexist comment was during the week or two immediately following the successful takedown of the Little Rock Public Corruption and Drug Enterprise investigation known as Delta Blues. Following the operation, it was clear to Bowling that Shepard was unhappy. Shepard's demeanor suggested that he was upset by being professionally upstaged by the then White-Collar Squad Supervisor who was a female. Shepard again entered Bowling's office near the end of the day, and with the same discriminatory and derogatory tone, made a nearly identical expression. He commented on how the "girls are at it again." Bowling's response was, "Which girls?" Shepard's reply was to name the White Collar Squad Supervisor and another female agent. Bowling ignored him and changed the subject.

36) On another occasion, Shepard displayed racial insensitivity toward an African American agent. This African American agent had had some negative contact with the local law enforcement agencies in northwest Arkansas. This agent was originally from an underprivileged economic background, and to his credit had become an FBI agent. During a conversation with

9

Bowling, Shepard opined that this agent was unsuitable to be an FBI Agent because of his "socio-economic background". As Shepard said "socio-economic" he made the double-quotes gesture with his hands. Bowling respected the agent, and was offended and pressed Shepard. "What do you mean by socio-economic?" Shepard's response was, "You know, where he s from." It was clear that Shepard was referring to his African American heritage and his relatively underprivileged economic background. This was a clear racist and prejudicial statement by Shepard.

37) Due to Defendant Shepard and Defendant Coleman's discriminating view of Bowling's faith-based commitment to his children, Bowling suffered negative employment treatment.

38) Coleman demanded that Bowling drop out of the FBI funded Graduate School program. Coleman demanded this so that Bowling would focus on Coleman's priorities. It is ubiquitous and expected across the FBI that ASACs should pursue graduate studies to improve their knowledge, leadership skills and improve their chances at promotions. Yet driven by his discriminatory mindset as demonstrated by his own words, Coleman demanded that Bowling withdraw from Graduate School. As a note, prior to Coleman's arrival, the two previous SAC's had approved and encouraged Bowling's participation in the FBI funded Graduate School. As a matter of responsiveness to his demands as the SAC, Bowling complied with Coleman's demands and discontinued his graduate studies.

39). Coleman also demanded that Bowling cancel his routinely scheduled summer annual leave for the last week of June, 2012 into the first week of July, 2012. This period of time is known to parents of high school athletes (of which Bowling's children were) as the "coaches' no contact period". This is when mandatory summer football and basketball practices for high

10

school athletes are generally not scheduled. It is in this period of time that Bowling has always taken his summer family vacations. Immediately prior to this scheduled leave, in a transparent attack on his family priorities, Coleman demanded that Bowling cancel his annual leave in order to attend to matters at the Little Rock Office. Coleman did so with the full knowledge that this was the only period of time when Bowling could vacation with his high school sons. Again, prior to Coleman's arrival, Bowling was able to take this period of time as vacation during FY 2009, 2010, and 2011, with no impact on his performance. As a matter of responsiveness to Coleman's demands as the SAC, Bowling complied and canceled that period of annual leave.

40) In a second action clearly targeted at Bowling's family, Coleman demanded that Bowling cancel his annual leave scheduled for July 16-20, 2012. This week of annual leave had been scheduled since well before the summer. This week was the 50th year anniversary family reunion for Bowling's in-law parents. At the time, the mother in law in question was beginning to suffer from cancer; cancer to which she finally succumbed in June, 2015. Bowling had discussed this matter with Coleman when he first arrived in the Little Rock Office, in one of their first meetings. During that meeting Coleman grew upset that Bowling would mention this matter, which Coleman made obvious was trivial in nature to him. As a matter of responsiveness to his demands as the SAC, Bowling complied and canceled that period of annual leave as well.

41) Despite Bowling complying with Coleman's demands to forgo his post-graduate studies and cancelling two family vacations, Coleman continued to push Bowling out as his ASAC. Coleman told Bowling that he was going to demand that Bowling be transferred unless Bowling agreed to leave his post as ASAC. On July 23, 2012, Bowling conceded to the threats of being involuntarily forced out of FBI management by Coleman. On the morning of July 23, 2012, Bowling met with Coleman and advised him that Bowling would prefer to remain in Little

Rock because of His sons' sports and His wife's teaching career. Coleman asked Bowling where He would want to be assigned. Bowling informed Coleman that He would like to be re-assigned as a Technically Trained Agent. Coleman agreed to reassign Bowling there, but then issued another threatened misuse of the Loss of Effectiveness transfer. Coleman stated, "You need to save face here, and if I hear that you have told anyone that I forced you out as the ASAC I will transfer you to New York."

42) The discriminatory intent of Coleman's actions, specifically with regard to Bowling's parental status was further demonstrated by his selection of Bowling's replacement. Immediately following Bowling's removal from his ASAC position, Coleman selected as the Acting NSB ASAC a person who was neither married, nor had ever had her own children. This is further an illustration of Coleman's disparate treatment of Bowling.

43) Another example of disparate treatment occurred when Coleman mandated that Bowling receive an unjustifiably low interim performance appraisal report, dated 11/23/2013. When SAC Valerie Parlave departed the Little Rock Office in approximately April, 2012, she had the option of completing an interim PAR for Bowling, documenting his performance from October1, 2011 until she departed as his SAC. She did not exercise this option.

44) On July 27, 2012, when Bowling was forced to step down as NSB ASAC by Coleman, policy dictated that Coleman was responsible for rating Bowling because the former SAC did not. Coleman did not rate Bowling, in violation of FBI policy. Thus, for FY 2012 Bowling received no PAR. This was an intentional violation of FBI process by Coleman.

45) Finally, on 11/23/2012, Bowling's Acting Supervisory Special Agent ("A/SSA") Diane Bayes asked Bowling to provide her feedback on his performance, so that she could submit an overdue PAR for Bowling.

12

46) Because of this policy violation, Bowling received no annual PAR for FY 2012, and

instead the field office, at Coleman's direction, substituted an Interim PAR from 7/27/2012 to

11/23/2012 as Bowling's annual PAR - again a policy violation.

47) Bayes submitted the following PAR Scores for Bowling to the LR front office for

consideration:

- Investigating, Decision Making, and Analyzing: Excellent
- Organizing, Planning, and Coordinating: Outstanding
- Relating to Others and Providing Professional Service: Excellent
- Acquiring, Applying, and Sharing Knowledge: Outstanding
- Maintaining High Professional Standards: Outstanding
    Communicating Orally and in Writing: Excellent
- Achieving Results: Excellent
- Intelligence: Excellent
- Overall: Excellent (4.38 score)

Based on the anchors in the FBI PAR standards, these scores were well substantiated.

48) On 12/12/2012 A/SSA Bayes presented Bowling's PAR scores to him.

Bowling's scores were as follows:

- Investigating, Decision Making, and Analyzing: Successful
- Organizing, Planning, and Coordinating: Successful
- Relating to Others and Providing Professional Service: Successful
- Acquiring, Applying, and Sharing Knowledge: Excellent
- Maintaining High Professional Standards: Successful
- Communicating Orally and in Writing: Excellent
- Achieving Results: Successful
- Intelligence: Excellent
- Overall: Successful (3.38 composite score)

49) When Bayes provided Bowling with his PAR, she advised that she had been directed

by A/ASAC Ekko Barnhill to lower his scores. The justification was that because he was

"starting out", his performance could not be rated highly, in spite of his documented performance

13

when compared to the specific anchors established by the FBI rating system. Furthermore. she stated that compared to other agents, Bowling's performance was recognized as outstanding. and by comparison should have been rated as such.   Bayes apologized to Bowling for the way in which he was being treated.   This recognition by Bayes further demonstrates that Bowling was the subject of a pattern of discriminatory activity, which was recognized by others in the office.

50) During this same conversation, Bayes confided that she believed Bowling was being treated exceptionally unfairly and that he was being singled out exclusively for unfair treatment and scrutiny, specifically by Coleman but also by Shepard.

51) Finally, she provided Bowling with the actual original printed copy of the draft PAR she had previously submitted. Based on her comments. it is demonstrated that the LR Front Office, specifically Coleman, acted discriminatorily to unjustifiably reduce Bowling's interim performance appraisal in November 2012, after Coleman deliberately violated policy by neglecting to provide Bowling with a performance appraisal in July 2012.

52) The motive for this discriminatory action was to prevent Bowling from having a positively reflecting PAR score in order to harm his professional performance record. This less positive PAR score could then be utilized to demonstrate mediocre performance in the event that Bowling sought legal action in the future challenging the discriminatory actions of which he was the subject.

14

## CLAIMS FOR RELIEF

### COUNT 1
### VIOLATION OF TITLE VII RELIGIOUS DISCRIMINATION

53) Plaintiff incorporates by reference the allegations in the preceding paragraph.

54) Defendants' actions constitute violations of Title VII of the Civil Rights act of 1964 as the Plaintiff was subjected to religious discrimination.

55) Defendant FBI employs hundreds of employees across the state.

56) Plaintiff was subjected to such discrimination based upon his religious views by supervisors who were empowered to make a significant change in the employment status of Plaintiff's employment, including demotion.

57) Plaintiff is a member of a protected class.

58) Plaintiff was treated disparately from that of his co-workers who did not have his deeply held religious beliefs.

59) Plaintiff was forced to accept a demotion, among other negative employment actions, and his position was filled by a female employee who did not have children and therefore was not bound by a religious belief to be a committed and devoted parent.

### COUNT 2
### VIOLATION OF THE CIVIL SERVICE REFORM ACT of 1978
### and EXECUTIVE ORDER 13152

60) Plaintiff incorporates by reference the allegations in the preceding paragraphs

61) The Civil Service Reform Act of 1978 prohibits employment discrimination based on an employee's parental status.

62) At the time of the controversy at matter in this case, the Plaintiff had children at home whom he shared the responsibilities of being the primary care giver for.

15

63) Plaintiff's wife had a demanding full-time job as a teacher and relied on Plaintiff to share care –giving responsibilities.

64) Plaintiff was told by his supervisor that he could no longer serve as ASAC if he insisted on being a committed father and sharing care-giving duties with his wife.

65) When Plaintiff refused to cease being a devoted father, Plaintiff was forced to leave his position and accept a demotion. Plaintiff was treated disparately from his co-workers.

66) Plaintiff was replaced by an employee who had no children and thus no care-giving responsibilities.

## COUNT 3
## VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT OF 1989 and VIOLATION OF THE FAIR LABOR STANDARDS ACT and VIOLATION OF THE ARKANSAS WHISLTLEBLOWER ACT, SPECIFICALLY ARK. CODE ANN 21-1-603(b)(2)(d)

67) Plaintiff incorporates by reference the allegations in the preceding paragraphs.

68) Plaintiff was asked by Defendant Coleman to perform an unconstitutional and illegal act. Plaintiff expressed concern about the illegality of the request, researched the legality of the request and informed Defendant Coleman of his concerns.

69) By asking Defendant Coleman to deliver a written order of the illegal act, Plaintiff put Defendant Coleman on notice of his intent to "blow the whistle" regarding Defendant Coleman's illegal request.

70) Defendant Coleman did not provide a written directive because he knew his request was illegal.

71) Shortly after Plaintiff's request for a written directive, Defendant Coleman initiated retaliatory employment actions against Plaintiff.

16

**COUNT 4**
**VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT**
**RELIGIOUS DISCRIMINATION**

72) Plaintiff incorporates by reference the allegations in the preceding paragraphs.

73) Defendants deprived Plaintiff of his rights, privileges and immunities secured by the Arkansas Civil Rights Act, Ark. Code Ann § 16-123-107.

74) Defendant's actions violate Ark. Code Ann § 16-123-107, which prohibits discrimination based upon religious beliefs and codifies the right to obtain and hold employment without discrimination.

75) Plaintiff is entitled to damages and equitable relief pursuant to the Arkansas Civil Rights Act.

**REQUEST FOR JURY TRIAL**

76) Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury for all claims and issues arising from this action.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in his favor and against Defendants.

(a) Grant Plaintiff a declaratory judgment that Defendants' actions described this Complaint violated Title VII, 42 U.S.C. § 1981; The Arkansas Civil Rights Act , Ark. Code Ann § 16-123-107; The Civil Service Reform Act of 1978 and Executive Order 13152; The Whistleblower Protection Act of 1989; The Fair Labor Standards Act; and The Arkansas Whistleblower Act;

(b) Grant Plaintiff a permanent injunction prohibiting Defendants from engaging in the illegal practices described herein;

(c) Award Plaintiff back pay, front pay, lost benefits, together with any other benefits that he would have earned or received had he not been illegally demoted or otherwise subjected to discrimination;

(d) Award Plaintiff compensatory damages for, without justification, preventing Plaintiff from receiving training and serving as a Technically Trained Agent;

(e) Award Plaintiff compensatory damages for mental anguish, pain and suffering, and embarrassment;

(f) Special and general damages available under federal and state law in an amount yet to be determined;

(g) Award Plaintiff compensation for all wages owed as well as liquidated damages;

(h) Award Plaintiff his costs and attorney's fees if such fees exist;

(i) Award Plaintiff prejudgment and post-judgment interest; and

(j) Award Plaintiff all other legal and equitable relief as the Court deems proper.

Respectfully Submitted

Mark Bowling
(Acting Pro Se)

711 E. Saline Circle
Benton, AR 72019
m.d.bowling@att.net

**EXHIBIT A**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Memphis District Office**

1407 Union Avenue
Suite 900
Memphis, TN 38104
(901) 544-0119
TTY (901) 544-0112
FAX (901) 544-0125
1-800-669-4000

| | |
|---|---|
| Mark Bowling,<br>      Complainant,<br><br>              v.<br><br>Attorney General,<br>DOJ Federal Bureau of Investigation,<br>      Agency. | ) EEOC No. 490-2015-00172X<br>) Agency No. FBI-2015-00014<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Date:   May 10, 2018 |

### ORDER ENTERING JUDGMENT FOR AGENCY

For the reasons set forth below in the DECISION WITHOUT A HEARING UPON AGENCY'S MOTION, a **Judgment For Agency** is entered.  A notice to the parties explaining their appeal rights is set forth below.

**SO ORDERED** this the *10th* day of *May*, 2018.

For the Commission:

Joseph M. Crout
Administrative Judge, EEOC
Memphis District Office

### DECISION WITHOUT A HEARING UPON AGENCY'S MOTION

## I. BACKGROUND

This matter is now before the EEOC on the Agency's Summary Judgment Motion pursuant to 29 C.F.R. § 1614.109(g) (Motion) (received July 18, 2016).  Complainant has responded to the Motion. A review of the record indicates that all other procedural pre-requisites have been met.  This matter is thus in a proper posture for decision on the Agency's motion.

1

SEP 1 3 2019

## II. ISSUE

Whether complainant was discriminated against based on his religion (Evangelical Christian/Baptist) when on or about September 10, 2014, he was notified he was suspended from duty, without pay, for 35 calendar days.

*(The undersigned notes that Complainant originally filed this claim on the additional basis of "parental status," over which the Commission has no jurisdiction. As such, the undersigned has only considered the proper issue based on religion set forth above.)*

## III. APPLICABLE LAW

The regulations allow an EEOC Administrative Judge to issue a decision without a hearing when she finds that there is no genuine issue of material fact or credibility in dispute. *See* 29 C.F.R. § 1614.109(g). This regulation is patterned after the summary judgment procedure set forth in Rule 56 of the Federal Rules of Civil Procedure and allows for the entry of summary judgment if the pleadings, answers to interrogatories, admissions, affidavits, and other evidence establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See also Murphy v. Department of the Army*, EEOC Appeal No. 01A04099 (July 11, 2003) (noting that regulation governing decisions without hearing is modeled after Fed. R. Civ. P. 56). Only disputes over facts that might affect the outcome of the suit under governing law, and not irrelevant or unnecessary factual disputes, will preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue of material fact if the relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not return a verdict for the party opposing summary judgment. *Id.*

In ruling on a motion for summary judgment, the Administrative Judge's function is not to weigh the evidence, but rather to determine whether there are genuine issues for hearing. *Id.* at 249. The evidence of the non-moving party must be believed at the summary judgment stage, and all justifiable inferences must be drawn in the non-moving party's favor. *Id.* at 255. In this administrative process, summary judgment may only be granted when the record is sufficiently developed to support a decision without a hearing, keeping in mind the quasi-investigative nature of these proceedings. *See Petty v. Department of Defense*, EEOC Appeal No. 01A24206 (July 11, 2003); *Murphy, supra.* Summary judgment cannot be granted by default, i.e., merely because the non-moving party failed to respond, as the Administrative Judge is "nevertheless responsible for examining the record to determine whether there [are] any issues of material facts in dispute and whether the agency, as the moving party, [is] entitled to judgment as a matter of law." *Bracey v. United States Postal Service*, EEOC Appeal No. 01912620 (November 6, 1991).

In the absence of direct evidence of discrimination, a claim alleging disparate treatment is examined under the three-part test set forth in *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under this analysis, a complainant initially must establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of

2

discrimination. *See St Mary's Honor Center. v. Hicks*, 509 U.S. 502, 507 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell-Douglas*, 411 U.S. at 802. The burden then shifts to the agency to articulate a legitimate, nondiscriminatory reason for the challenged actions. *See Burdine*, 450 U.S. at 253-54; *McDonnell-Douglas*, 411 U.S. at 802. Ultimately, a complainant must prove, by a preponderance of the evidence, that the agency's articulated reason for its action was not its true reason, but a sham or pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000); *Hicks*, 509 U.S. at 511; *Burdine*, 450 U.S. at 252-53; *McDonnell-Douglas*, 411 U.S. at 804.

In the absence of direct evidence of discrimination, a complainant has the initial burden of establishing a *prima facie* case of discrimination under *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973). Specifically, a complainant must demonstrate that he/she was treated less favorably than a similarly situated employee outside his/her protected group.

It is well established that in order for two or more employees to be considered similarly situated, all relevant aspects of the employees' work situation must be identical or nearly identical, *i.e.*, that the employees report to the same supervisor, perform the same job function, and work during the same time periods. *See Sibley v. U.S. Postal Service*, EEOC Request No. 0520070076 (February 6, 2007) (citing *Anderson v. Department of Treasury*, EEOC Appeal No. 01A22092 (March 13, 2003).

Without evidence that the complainant and another employee are similarly situated, a complainant's "mere assertion that another employee was granted a schedule change does not create a genuine issue of material fact." Manning v. United States Postal Service, EEOC Appeal No. 01A41427 (July 28, 2005).

Pretext can be demonstrated by "showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [agency's] proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence." *See Dalesandro v. U.S. Postal Service*, EEOC Appeal No. 01A50250 (January 30, 2006) (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

## IV. ANALYSIS AND FINDINGS

The undersigned has conducted an independent review of all pleadings related to the Agency's Motion, and the investigative file (*hereinafter* IF) and finds that the Motion is well taken. The Agency's statement of material facts has been thoroughly reviewed and compared against the facts as reflected in the IF. The Agency's statement of material facts is incorporated by reference, pursuant to Chapter 5, Section II, Subsection (D)(1) of the Administrative Judges' Handbook, and if there are any caveats, they are discussed below. Taking the evidence in the light most favorable to Complainant and drawing all reasonable inferences in his favor, there are no genuine issues of material fact or issues of credibility, and the Agency is entitled to judgment as a matter of law.

3

The undersigned has thoroughly reviewed the Agency's Motion for Summary Judgment and the Agency's Reply Brief, as well as the IF, and has found the Agency's Motion and Reply to be well founded in both law and fact. For that reason, the undersigned adopts the Agency's reasoning as set forth in its Motion and Reply in determining that Summary Judgment is appropriate in this case. The Motion addresses the one issue at length, and there is really nothing that the undersigned can add. There is no question as to any material fact in the one issue raised by Complainant that would present a material fact question making Summary Judgment inappropriate.

As the Agency points out, it has presented legitimate business related and non-discriminatory reasons for its actions. The Complainant carries the burden of proving, through material facts that the Agency's stated reasons are not trustworthy, and instead are a pretext for illegal discrimination, retaliation, and harassment. Complainant, simply put, has not presented proof, through material facts that the Agency's stated non-discriminatory reasons are pretextual.

Specifically, the undisputed material facts pertaining to the Agency's legitimate business related non-discriminatory reasons for its actions, show that the Complainant submitted a form FD-331 outside employment request to provide cyber work for an outside company, AECC. The Complainant checked "No" in response to the question asking whether AECC was impacted by his FBI duties. An October 24, 2012 document, drafted by the Complainant, detailed a meeting between AECC and him that resulted in a working relationship.

The Inspection Division discovered the existence of a separate company that was incorporated by the Complainant that was not reported to the FBI. This company received compensation for work performed that was not reported to the FBI. These actions were not authorized by Section 4.8.5.2 of the Outside Employment – Policy Implementation Guide maintained by the Agency. These actions constituted a violation of FBI Offense Code 2.12. Moreover, because the evidence reflected that the outside business work was performed on FBI computers, the Complainant's actions also constituted a violation of FBI Offense Code 3.6. The OPR reviewed these facts and considered the Complainant's defense before issuing the final suspension. The undersigned, after reviewing the IF as well as all pleadings has determined that the suspension is grounded in undisputed facts, and that there is no evidence in the IF or the pleadings that would raise a material fact question concerning whether the suspension was issued due to the Complainant's religious affiliation, (Evangelical Christian/Baptist). All of the proof points to the fact that the Agency suspended Complainant due to the policy violations set forth above.

Finally, at the end of the day, Complainant must offer proof, through material facts, and not simply belief or conjecture, that the allegations are borne out, and that the reason for these actions was to discriminate against him based upon his religion. In this regard, Complainant has offered that a fellow employee told him that a supervisor, Shepard, did not like Christians. Complainant did not hear this statement made, nor has he offered any proof of any nexus between this alleged second-hand statement and the lengthy involved investigation of his outside work that was not reported to the Agency that led to his suspension. Complainant simply has not met this burden to show that religion was a factor in any of the decisions made by the Agency, or that religion was the true reason for his suspension and that the Agency's stated reasons,

4

following an investigation were a sham or pretext.  For these reasons, the undersigned finds that Complainant has not raised any genuine issue of material fact that the Agency's actions were illegal or that its stated reason for its actions were pretextual, and thus Summary Judgment is appropriate.

## V. CONCLUSION

Therefore, viewing the evidence as a whole and in the light most favorable to Complainant, the undisputed evidence supports the conclusion that the Agency is entitled to Summary Judgment on Complainant's complaint.  Because there are no genuine issues of material fact or credibility, and the Agency is entitled to judgment as a matter of law, the Agency's Motion for a Decision Without a Hearing is **GRANTED**.

## VI. NOTICE

### *TO THE AGENCY:*

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. § 1614.403, and append a copy of your appeal to your final order.  *See* EEOC Management Directive 110, August 5, 2015, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

### *TO THE COMPLAINANT:*

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a).  From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order.  *See* EEO MD-110, 9-3.  In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to

the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

## *WHERE TO FILE AN APPEAL:*

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

BY MAIL:

Director. Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

BY PERSONAL DELIVERY:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, NE
Suite 55W12G
Washington, D.C. 20507

BY FACSIMILE:

Number: (202) 663-7022

Facsimile transmissions of more than ten (10) pages will not be accepted.

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency. If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The agency shall resolve the matter and respond to the complainant in writing. If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

**EXHIBIT B**

Mark Bowling
711 E. Saline Circle
Benton, AR 72019
m.d.bowling@att.net
(501) 326-5167

September 5, 2015

Federal Tort Claims Act Section
Torts Branch, Civil Section
US Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, DC, 20044

To whom it may concern:

Please be in receipt of the attached Federal Claim.  I am providing the attached SF-95 to your office in a preemptive effort to exhaust all appropriate administrative remedies prior to filing an anticipated tort action against the U.S. Department of Justice (DOJ) and the Federal Bureau of Investigation (FBI).  If this office is not the appropriate office, please advise me by U.S. Mail, and forward these documents to the appropriate office in the FBI.

As a note, this is not going away.  I have a substantial income from my current position, and I intend to use those resources to conclusively prove, publically, that the FBI engaged in serious, criminal misconduct and the DOJ-OIG negligently looked the other way.  After I win my case in District Court, I intend to file Biven's actions against those in the FBI who engaged in unconstitutional criminal and willfully negligent conduct.  I have retained legal counsel in a related action, but if the DOJ wishes attempt to settle these matters in a consolidated fashion, please advise me via U.S. Mail.

Respectfully yours,


Mark Daniel Bowling

**Addendum #6**

**Dates of Incidents:**

3/13/13
3/13/13 to 10/23/13
5/22/13
6/12/13
6/19/13
7/19/13
10/23/13
10/23/13 to 4/14/14
11/6/13
4/14/14
6/30/14
9/3/14
1/7/15

Addendum #9

Property, Nature, and Extent of Damages:

1. Emotional Stress and Psychological Stress.

2. Proposed loss of income from 35 day proposed suspension.

3. Loss of Retirement Income from January 31, 2017 and January 31, 2023.

4. Loss of percentage part of Retirement from January 31, 2023 until deceased.

5. Loss of Special Agent income from January 23, 2015 until January 31, 2017.

6. Loss of Advancement Opportunity from March 11, 2013 until January 23, 2015.

7. Cost of separation from family, January 23, 2015 until July 31, 2015.

8. Value of Personal Time utilized in fighting false allegations.

9. Cost of Legal Expenses.

10. Cost of Travel to D.C. to fight false allegations in the Oral Hearing, in or around July 18, 2014.

11. Value of Personal Annual Leave utilized to travel to fight false allegations at the Oral Hearing, July 18, 2014.

The injured party is Mark Daniel Bowling.  He resides at 711 E. Saline Circle, Benton, AR, 72019.

Addendum #10

Personal Injury Damages:

1.  Emotional Stress and Psychological Stress, including stress on family due to separation and proposed suspension:  $300,000.

2.  Proposed loss of income from 35 day proposed suspension: $13,080.

3.  Loss of Retirement Income from January 31, 2017 and January 31, 2023, calculated at $149,000 (high three) at 41% per year: $366,540.

4.  Loss of percentage of Retirement from January 31, 2023 until deceased, calculated at the difference between 41% per year and 27% per year, beginning in January 31, 2023, until a median death age of 95:  $813,540.

5.  Loss of FBI Special Agent income from January 23, 2015 until January 31, 2017, calculated at $136,000 per year times two years and one pay period (53 pay periods): $277,230.

6.  Loss of Advancement Opportunity from March 11, 2013 until January 23, 2015, calculated at the difference between LR GS-13-10 pay and LR GS-14-7 for a period of 49 pay periods:  $22,480.

7.  Cost of separation from family, January 23, 2015 until July 31, 2015 in actual travel, rental, and food expenses:  $8,100.

8.  Value of Personal Time utilized in fighting false allegations, valued at $60.00 per hour, using approximately: $7,200

9.  Cost of Legal Expenses:  $7,500 to date.

10. Cost of Travel to D.C. to fight false allegations in the Oral Hearing, in or around July 18, 2014:  $1,000

11. Value of Personal Annual Leave utilized to travel to fight false allegations at the Oral Hearing, July 18, 2014, hourly value of AL time as of current date, $60.00 hour, times 13 hours: $780

The injured party is Mark Daniel Bowling.  He resides at 711 E. Saline Circle, Benton, AR, 72019.

Addendum #11

List of Witnesses:

1. Paul Behling; is able to provide a clear statement regarding my full-time job search with HBS, and will refute the false notion that the draft SOWs were responsive to a request for CJIS pricing data in Arkansas.

2. Diane Bayes; is able to provide a clear statement regarding my assignments as a HUMINT and Applicant Agent, my level of performance as an investigator, and her perception that I was deliberately treated discriminatorily and unfairly by the FBI, specifically by Coleman and Shepard.

3. Ekko Barnhill; is able to provide a clear statement regarding Shepard's and Coleman's personal animosity for me, Shepard's lack of integrity, and Shepard's historical misuse of the OPR disciplinary process.

4. Mike Dick; is able to provide a clear statement regarding Coleman's historical misuse of the OPR disciplinary process, and Locasio's historical willingness to utilize false statements in an OPR inquiry.

5. DeAnna Vargas; is able to provide a clear statement regarding Shepard's current misuse of the OPR disciplinary process, Locasio's historical willingness to utilize false statements in an OPR inquiry, the FBI's ongoing harassment of her as an EEO whistle-blower, and Shepard's verbal admission that he was "good friends" with Locasio.

6. Tiffany Pressler; is able to corroborate Paul Behling's statement regarding the time frame in which Behling and HBS became interested in CJIS Compliance in Arkansas. She will further provide a statement that I never asked her or AAMSCO for pricing data for any CJIS Compliance efforts.

7. Joshua Blockburger; is able to provide a clear statement regarding Shepard's willingness to misuse the OPR process and the lack of due process implemented in the FBI OPR process. Blockburger will further provide a clear statement regarding Shepard's reputation for dishonesty and misrepresentation of facts.

8. Mike Mitchell; is able to provide a clear statement regarding the DOJ-OIG investigation he was subjected to as a result of Shepard's false statements.

9. Phillip Huff; is able to provide a clear statement establishing the fact that my actions as a HUMINT investigator had no affect on the operations of AECC.

10. Robert McClanahan; is able to provide a clear statement establishing the fact that my actions as a HUMINT investigator had no affect on the operations of AECC.

11. Jay Wagnon; is able to provide a clear statement establishing the fact that I was never assigned to InfraGard, I was never an InfraGard Case Participant, and that I never had any role in the InfraGard Program.

12. Rebecca Passmore; is able to provide a clear statement establishing the fact that as a CART FE in Little Rock, she found no evidence of any wrong-doing on the hard drives which she examined at the direction of OPR.

13. Paul Reid Davis; is able to provide a clear statement that he was directed by the Little Rock EM, in FY 2013 and FY 2014, to specifically reduce my Performance Appraisal Rating (PAR) scores, for the purpose of lowering them to the highest Excellent rating, so that I would not be rated Outstanding because of concerns associated with my OPR.  Davis will also be able to make a statement regarding Shepard's reputation for lack of integrity and manipulative and dishonest behavior.

**Addendum #12**

**12.a.   Property Damages:  $0.00**

**12.b.   Personal Injury Damages:  $1,809,950.00**

**12.c.   Wrongful Death Damages:  $0.00**

**12.d.   Total:  $1,809,950.00**



**U.S. Department of Justice**

Civil Division, Torts Branch
Federal Tort Claims Act Staff

Post Office Box 888
Benjamin Franklin Station
Washington D.C   20044

GKJ:HLSwann:hls
157-16-NEW

September 15, 2015

Mr. Mark Daniel Bowling
711 E. Saline Circle
Benton, AR   72019

      Re:   Administrative Tort Claim of Mark Daniel Bowling

Dear Mr. Bowling:

      This is in response to your administrative tort claim dated August 28, 2015, which you submitted to the Department of Justice (Department).   The Department received the claim on September 9, 2015.   The Department will be handling your claim as lead agency pursuant to 28 C.F.R. § 14.2(b).   All future correspondence concerning this claim should be directed to the Department at the address above.   I will contact you if further information is needed.

      Very truly yours,

HOPE L. SWANN
Legal Assistant
Civil Division, Torts Branch